Filed 1/13/26  In re J.O. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.O., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>T.O.,<br><br>        Defendant and Appellant. | A174106<br><br>(San Francisco City & County Super. Ct. No. JD23-3272) |

T.O.[1] (mother) appeals from the juvenile court's order terminating her parental rights over now two-year-old J.O. pursuant to Welfare and Institutions Code section 366.26.[2]  Mother contends the court erred in declining to apply the parental benefit exception to termination under section 366.26, subdivision (c)(1)(B)(i).  We affirm.

---

[1]  Mother is sometimes referred to as T.B.  We refer to her as mother or T.O. consistent with the parties' references.  Father is deceased and is not a party to this appeal.

[2]  All further statutory references are to the Welfare and Institutions Code.

# BACKGROUND

*Proceedings Leading to Reunification Services*

In July 2023, the San Francisco Human Services Agency (Agency) received a referral that mother may have "relapsed on methamphetamines while she was alone in the community with [one-month-old J.O.] The baby fell out of his stroller, but mom did not seek medical attention for him. In addition, during earlier inciden[ts], mom was seen holding the baby in an unsafe manner. It was reported that she held him on her hip without supporting his head, she held him with one hand over her own head, and she held him in a way that put him a headlock." A month later, mother tested positive for amphetamines, although she denied taking any substances. The referral also noted mother had an older child, then 20-year-old D.J., over whom maternal grandmother had obtained legal guardianship.

In September, the Agency filed a section 300 petition alleging a failure to protect (§ 300, subd. (b)). The petition specifically alleged mother has substance abuse and mental health issues, requiring assessment and treatment and that mother has "cognitive and physical limitations" that impact her ability to independently parent J.O. (Capitalization omitted.) At that time, J.O. was not detained but a safety plan was put in place, whereby mother had to be "supervised at all times" by family members when she was with J.O. Additionally, mother was to complete random drug testing.

The Agency filed a supplemental petition, adding allegations that mother had failed to follow through with her safety plan by leaving her previous placement, disappearing "for hours and not disclos[ing] where she was going," and missing a drug testing appointment.

In its detention report, the Agency recommended J.O. be detained and that mother complete a psychological evaluation "to assess parenting capacity

and cognitive abilities." Mother had missed her random drug tests, and maternal aunt "expressed concerns" regarding mother's behavior. For example, she would leave maternal grandmother's home in the morning, remain away from home all day until "late in the evening," and not call to check on J.O. The safety plan required mother "to do the lion's share of taking care of [J.O.], and [maternal grandmother] now believes the mother is taking advantage of the family support," as the family was often left to care for or purchase milk for him. Maternal grandmother had also called the police and wanted mother out of her home, after mother was "angry, slamming doors[,] and calling family members derogatory names." Another safety plan was prepared whereby J.O. would stay with maternal grandmother and mother would, among other things, continue calling and drug testing daily; visit and care for J.O. daily for two hours; and enroll in a residential treatment program where she could have J.O. with her. Mother had previously been in a program but "self-discharged . . . because of their strict rules," and her spot was no longer available. The Agency was attempting to secure mother another bed at her previous facility.

Based on the supplemental petition, the court removed J.O. from mother's care and set the matter for a jurisdiction/disposition hearing.

In its jurisdiction/disposition report, the Agency recommended the allegations in the petition be sustained, J.O. be declared a dependent child of the court, and that reunification services be offered.

Mother had a good support system from maternal grandmother and maternal aunts. The family believed mother "may never be able to parent [J.O.] independently, but also express[ed] their commitment to keep mom and [J.O.] in the family permanently." "[M]other has health concerns that appear to interfere with her ability to process time," and she often lost track of time

3

and could not retain information. Additionally, mother had "suffered a head injury and multiple strokes," which resulted in her having "occasional difficulty using her right arm[]/hand." She was on psychotropic medication for depression and medication for nerve damage. Finally, mother had a 20-year substance abuse history. Although she was currently "testing negative for all substances," she had been referred to family treatment court for additional support but missed her initial intake appointment. The Agency recommended mother complete a psychological evaluation to assess her cognitive abilities and parenting capacity. J.O. was doing well in his placement with maternal grandmother.

The court sustained the amended allegations,[3] found there was substantial danger in returning J.O. to mother's care, declared him a dependent child, continued his placement with maternal grandmother, and ordered reunification services and supervised visitation for mother.

*Proceedings Leading to Termination of Services*

In its six-month status review report, the Agency recommended an additional six months of services. Mother had completed 14 out of 15 visits, and the visits were "reported to be going very well," although on two visits J.O. was returned to maternal grandmother's care "with wet diapers" and "starving" as he was sent back "without having been fed the amount of food sent" with him on the visit. Mother completed her psychological evaluation but had not completed her substance use assessment. Mother had been "very

---

[3] The petition was amended to allege mother had a substance abuse issue that requires assessment and treatment as evidenced by her positive test for methamphetamines in August 2023 and that when mother was interviewed, the social worker reported mother's speech was slurred and she appeared under the influence (count B-1) and that mother has cognitive and physical limitations that impact her ability to independently parent (count B-3). The remaining allegations were stricken.

4

inconsistent with her [r]andom drug testing," and she had tested positive for amphetamines, methamphetamines, and ethyl glucuronide on one occasion. Though mother had made some "positive progress" with her case plan, the Agency remained concerned mother "may still be using illicit substances as she has not engaged at all in any Substance Abuse Treatment," and she had only tested once during the reporting period and that test was positive.

The court found mother's progress in alleviating the causes necessitating placement had been "[a]dequate" and continued reunification services. The court continued J.O. in his current placement, continued visitation as previously ordered, and set the matter for a 12-month review hearing.

In its 12-month status review report, the Agency recommended termination of services and that the court set a selection and implementation hearing pursuant to section 366.26, with adoption as the permanent plan.

Mother had made 29 out of 32 scheduled visits. She had also been having extra weekend visitation with J.O. under maternal aunt's supervision. However, during the reporting period, mother's relationship with maternal aunt had deteriorated and those visits had been stopped as mother was no longer "on speaking terms with her sister." Maternal grandmother had offered extra visitation instead, but mother had not followed through with her.

Mother had only tested six out of 45 times during the reporting period. One test was negative for all substances, four were positive for amphetamines and methamphetamines, and one was negative "but it was noted that the test had been diluted." When confronted with the positive tests, mother became upset, assured the social worker she was not using, and did "not understand why the tests [were] positive." When the social worker

5

offered mother the option to take a "hair follicle test," mother refused. Mother had completed her substance use assessment, and she was provided a list of several outpatient treatment programs but had not enrolled in any of them.

Mother had failed to follow up with her "medical needs," missing her most recent appointment with "her navigator with Team Lily at General Hospital." Mother had been attending therapy through the Trauma Recovery Center, but she reported her therapist left and she stopped therapy. The social worker submitted a new referral for mother. J.O., then one years old, was doing well in his placement.

In an addendum report, the Agency's recommendations remained the same. The Agency noted the concerns about mother's substance abuse and mental health continued, and most recently "domestic violence has once again began [*sic*] to impact [mother], as she became involved in a relationship, which led to her arrest due to a domestic dispute." Additionally, mother was found in possession of drug paraphernalia, "adding to the concern [mother] may not be sober."

The court terminated services and set the matter for a section 366.26 hearing. The court ordered weekly supervised visitation but allowed mother and maternal aunt to arrange additional visitation on condition that maternal aunt be present during the visits.

*Proceedings Leading to Termination of Rights*

In its section 366.26 report, the Agency recommended termination of mother's parental rights, that J.O. remain with maternal grandmother, and that he be ordered placed for adoption. J.O., then 20 months old, had been with maternal grandmother since he was two months old, and he continued to "thriv[e] in the home." The Agency noted mother had been consistent with

6

her visitation, "for the most part," as there had been some missed visits when mother had not shown up or the Agency was unable to confirm visitation with mother. Visitation had "been very positive between [J.O.] and his mother."

Mother and J.O. "have a very positive" and "strong" relationship, and J.O. "is all smiles as soon as he sees his mother nearing the visit." Mother was "very loving and interactive" with J.O. during visitation, and J.O. "enjoys the time that he spends with his mother." Mother did "well in the supervised setting in addressing [J.O's] needs of feeding and diapering."

The Agency noted J.O. was likely to be adopted. He was described as a "always smiling and interacting with people around him" and as having an overall "positive disposition." Maternal grandmother could provide a "safe and permanent home," which was in his best interest. J.O. would have "permanency with his family and be a part of his extended family," including his five-year-old cousin who also lived with him. Maternal grandmother, who had previously obtained legal guardianship of J.O.'s sister, believed the permanent plan of adoption would provide J.O. with "the most permanent and stable outcome both physically and emotionally."

In an addendum report, the Agency continued to recommend termination of rights and adoption by maternal grandmother. J.O., now two years old, continued to thrive in his placement. Mother had been consistent with her visitation, and J.O. "smiles and runs up to" mother when she visits, greeting her "with a hug and a kiss." The family reported J.O. enjoyed visiting and playing with mother. However, when he "becomes hungry, tired or becomes upset he seeks out comfort from other family members." Maternal grandmother continued to provide J.O. with "a safe, stable and loving home" and made sure he "received recommended medical treatment, vaccinations and dental treatment."

7

At the section 366.26 hearing, the court heard from counsel.[4]

Mother's counsel requested the court find the parental benefit exception applicable. Counsel argued mother had consistently visited J.O., and those visits "are emotionally rich and developmentally appropriate," and that he "smiles and runs up to [mother] . . . and greets her with a hug and a kiss." Counsel noted the section 366.26 report stated J.O. has "a strong relationship with his mother," that mother and J.O. "have a very positive relationship and that [he] is all smiles as soon as sees his mother nearing the visit." J.O. enjoyed spending time with mother, and mother "performs well in the supervised setting, addressing his needs for feeding and diapering and keeping the visit both fun and safe." Finally, counsel argued "[g]iven the depth of this bond," J.O. "is attached to his mother," termination would be detrimental to J.O. His and mother's relationship, "if severed, would not be easily replaced or forgotten." Counsel noted adoption "in this case induces an added layer of emotional complexity," and J.O. will "grow up knowing that his grandmother adopted him away from his biological mother despite Mother remaining present, consistent, and committed to him. This reality may foster confusion, internal conflict, and even resentment in [J.O.] when he is older." Counsel asserted the "psychological impact of feeling as though his grandmother took him away from his mother, however, unintentionally, cannot be ignored." Thus, counsel requested legal guardianship instead of termination.

---

[4] Mother was not present. Her counsel explained she had a criminal case, and counsel requested her appearance be waived. The court had previously called the case on June 18 and July 2, 2025, and mother was not present. At the July 2 hearing, the court continued the case until July 7 but noted if mother was not present at the next hearing date the court intended to proceed in her absence.

The Agency asked the court to terminate parental rights. The Agency conceded mother "has made visits," and that "the confined visits go well." However, counsel maintained the "visits are not parent-child visits but more like a friendly relationship in which the child enjoys the visits with the biological mother." Counsel asserted the beneficial relationship here is "more to the parent than the child," and that J.O. was "receiving all of the parental needs in the care of the caretaker." Whether J.O. would have resentment toward maternal grandmother was speculation. The Agency believed the current home is appropriate, it would be J.O.'s "forever home," and "it will meet all of his needs."

The Agency did not believe severing the relationship would have "an impact that would prevent this Court to not go forward with the adoption." Finally, the Agency felt legal guardianship would be better for mother, not J.O. However, with the termination of services, the focus shifts to the minor's best interests, and adoption as "the most permanent plan that can be given and the most secure plan," would be in J.O.'s best interest.

J.O.'s counsel joined with the Agency. Counsel further noted mother's progress had been minimal in terms of drug treatment and testing and mental health treatment and follow up. Counsel was also concerned about mother's "new arrest for domestic violence." The "new arrest is a new romantic relationship, but this is a recurring pattern with her, and [J.O.] is two, but he is an active two, and he requires a lot of supervision, and he is living in a home with his adoptive cousin."[5] J.O. and his cousin had been "lifelong partners in [maternal grandmother's] home, and if there is any separation, the anxiety would be from this foster sister, who is his sister

---

[5] Maternal grandmother had also recently adopted a child from one of J.O.'s maternal aunts.

actually, and from his grandmother." Although J.O. enjoyed visits with mother, counsel pointed out when J.O. needed comfort he turned to maternal grandmother.

The court concluded the exception had not been established. The court found mother had established the first prong, regular visitation and contact. However, mother had not established the second prong, the existence of a relationship the continuation of which would benefit J.O. The court first went through the *Caden C.*[6] factors: "the child's age, the time spent out of parental custody, a positive or negative affect of any interaction between the parent and the child, the child's particular needs, and how does the child look to, feel about, and interact with the parent." The court then stated, "[t]he positive attachment between parent and child has been described as nurturing, one that provides the child with a sense of security and stability, an emotional attachment that is one where the child views the parent as more than a mere friend or playmate. [¶] And here I acknowledged that the visits between [mother] and the child have gone well. They are positive. It is clear that she loves the child and that she is attentive and loving towards him, and I agree with the assessment in the .26 report, . . . that the relationship is a strong one, but I am concluding that [mother] has not established that prong. [¶] The petition was filed . . . when the baby was two months old. The child has been out of [mother's] care since then. The visits have been supervised. [¶] The information in the addendum report, which I find credible and which I rely on, suggests that the relationship between [mother] and the child is more like that of a friend or playmate." Although J.O. "enjoys" seeing mother, when he sought comfort or when he was upset,

---

6 *In re Caden C.* (2021) 11 Cal.5th 614, 631, 636 (*Caden C.*).

10

he sought out other family members, including maternal grandmother but not mother.

In any event, continued the court, even had she established the second prong, mother had not established the third, that termination of parental rights would be detrimental to J.O. The court did not find mother's counsel's hypothetical assertion that adoption would cause "the possibility of confusion and resentment" supported by the evidence. The court also declined to credit counsel's assertion that J.O. "would view the maternal grandmother as taking him away from his mother." The court stated, "No one has done that. The reality is that [mother] has failed to reunify with the child."

The court concluded the Agency established adoption was in J.O.'s best interest, and J.O. had lived with maternal grandmother "nearly his entire life" and was "thriving in her care." He had a "strong connection" with maternal grandmother's home and was "surrounded by family." Although counsel urged legal guardianship, the court stated "the legislature has decreed that adoption is the preferred plan in part because it affords the child the most permanency, security, and stability. Guardianship . . . is not irrevocable and falls short of the secure and permanent placement intended by the legislature."

The court found by clear and convincing evidence J.O. was likely to be adopted and terminated mother's parental rights.

## DISCUSSION

The parental benefit exception to the termination of parental rights applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent must prove, by a preponderance of evidence, three things: "(1) regular visitation and contact, and (2) a

11

relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C., supra*, 11 Cal.5th at pp. 631, 636, italics omitted.)  We review the first two elements for substantial evidence, and the third for abuse of discretion.  (*Id.* at pp. 639–640.)

" 'The first element [of the exception]—regular visitation and contact— is straightforward.  The question is just whether "parents visit consistently," taking into account "the extent permitted by court orders." ' " (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).)

"The second element, in which the court must determine whether the child would benefit from continuing the relationship with [his or] her parent, is more complicated.  '[T]he relationship may be shaped by a slew of factors, such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." [Citation.]' (*Caden C., supra*, 11 Cal.5th at p. 632.)  '[C]ourts often consider how children feel about, interact with, look to, or talk about their parents.' (*Ibid.*)  *Caden C.* instructs us that 'it is not necessary—even if it were possible—to calibrate a precise "quantitative measurement of the specific amount of 'comfort, nourishment or physical care' [the parent] provided during [his or] her weekly visits." [Citation.]' (*Ibid.*)  Expert opinions or bonding studies provided by psychologists who have observed and/or reviewed the parent-child relationship are often 'an important source of information about the psychological importance of the relationship for the child.' (*Id.* at pp. 632– 633, fn. omitted.)  Ultimately, the court's role is to decide whether the child has a ' "significant, positive, emotional relationship with [the parent.]" ' (*Id.* at p. 633.)" (*Katherine J., supra*, 75 Cal.App.5th at pp. 316–317.)

12

"The third and final element asks the court to ascertain whether severing parental ties—and thus 'terminating [the] parental' relationship—would be detrimental to the child.  (*Caden C., supra*, 11 Cal.5th at p. 633.)  'What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life.'  (*Ibid*.)  Because any harm caused by loss of this relationship may be significantly mitigated by the child's adoption into a stable, loving home, the court must then perform a delicate balancing act.  The 'subtle, case-specific inquiry [that] the statute asks courts to perform [is]: does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]" '  (*Ibid*.)  'When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be "detrimental to the child due to" a child's beneficial relationship with a parent.'  (*Id*. at pp. 633–634.)"  (*Katherine J., supra*, 75 Cal.App.5th at p. 317, italics & fn. omitted.)

There is no dispute the trial court concluded mother carried her burden as to the first element.

As to the second element—whether the child would benefit from continuing the relationship with the parent—mother contends the juvenile court failed to recognize the strength and significance of her bond with J.O.  She likens her case to *In re B.D.* (2021) 66 Cal.App.5th 1218 (*B.D.*).

In *B.D.,* the juvenile court did not have the benefit of *Caden C.,* when it concluded although the parents consistently visited the children, who were approximately eight and five years old at the time of the section 366.26 hearing, the parents "did not fulfill a parental role."  (*B.D., supra,*

13

66 Cal.App.5th at p. 1224.) Upon review, the appellate court stated the record "suggests that the parents presented evidence to support a finding that they had a beneficial relationship," noting the minors were always happy to see the parents, greeting them with hugs, the visits ended with hugs and kisses, and the minors expressed sadness at the end of visits because they did not understand why they could not live with the parents. (*Id.* at p. 1229 & fn. 4.) In remanding the case, the appellate court provided further guidance to the juvenile court noting, "A 'significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.' [Citation.] A positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability. Finally, an emotional attachment is one where the child views the parent as more than a mere friend or playmate and who's interactions with the parent were not ambivalent, detached, or indifferent. (*Id.* at p. 1230.) To address whether there was such an attachment, the court should take "into consideration the child's age, the portion of the child's life spent in parental custody, the positive or negative impact of interaction with the parent, and the child's particular needs." (*Id.* at p. 1230, fn. 5.)

The instant case is distinguishable. To begin with, the minors in *B.D.* were much older than J.O. and expressed sadness at the end of visitation. There was no such expression of sadness observed here. Additionally, the court here was guided by and well aware of *Caden C.*, and the court thoroughly evaluated the relationship between J.O. and mother.

Mother contends the "positive" nature of her visits led both the Agency and the court "to describe [her] relationship with [J.O.] as strong." While true, both counsel for the Agency and J.O., as well as the court, went on to

14

describe that relationship as one of mere friendship.  Specifically, the court observed that although visitation went well, J.O. sought comfort, solace, and fulfillment of his needs with maternal grandmother—not mother—and that visitation with mother was more akin to a relationship with a playmate than that of a significant, emotional, and substantial attachment.  In short, substantial evidence supports the juvenile court's finding.

Having concluded the juvenile court did not err in finding mother did not meet her burden of establishing the second prong, we need not evaluate the court's conclusion as to the third.

Nevertheless, even assuming there was such a relationship, mother has not demonstrated loss of the relationship would be detrimental to J.O. "to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 634.)

Mother contends the court abused its discretion in relying on J.O.'s bond with maternal grandmother, rather than "the detriment of severing his relationship with his mother" and the "specific harm [J.O.] would suffer from losing the significant and positive attachment."  However, the juvenile court considered what J.O.'s "life would be like without [mother] in it," and found terminating mother's relationship with J.O. would not be detrimental.  There was no evidence presented at the hearing or in any of the reports, that J.O. would suffer detriment with the termination of parental rights.  At the hearing, counsel merely speculated adoption "may foster confusion, internal conflict, and even resentment in [J.O.] when he is older."  Counsel's speculation is not evidence, and the court did not credit it.

By the time of the termination hearing, J.O. was two years old, with the proceedings having begun when he was two months old.  It is true mother's visitation with J.O. was generally positive.  But the evidence simply

15

did not show a significant relationship, the loss of which would outweigh the benefits of the permanence and stability of adoption in light of J.O.'s age, time away from parental care, and the detriment that would arise form a disruption of his current care. (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 820 ["There is no question that there are some benefits in continued visits with loving parents to which a child has some substantial attachment. Yet to justify withholding the 'security,' 'stability,' and ' "sense of belonging a new family would confer" ' [citation], the parents must prove more than ' "*some* benefit." ' "]; *In re G.H.* (2022) 84 Cal.App.5th 15, 25 ["[f]riendly or affectionate visits are not enough" to overcome preference for adoption].)

## DISPOSITION

The juvenile court's order is affirmed.

_____

Banke, Acting P. J.

We concur:


_____

Langhorne Wilson, J.


_____

Smiley, J.

A174106, In re J.O.

17